# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

KIMBERLY BABIN                                                    CIVIL ACTION

VERSUS

THE LOFTON CORPORATION, ET AL.                    NO. 20-00754-BAJ-SDJ

## RULING AND ORDER

Before the Court are Defendant IMTT-Gesimar and Defendant The Lofton Corporation's **Motions for Summary Judgment (Doc. 12; Doc. 13)**. The Motions are opposed. (Doc. 16; Doc. 19). Defendants filed Reply Briefs. (Doc. 20; Doc. 21; Doc. 24). For the reasons stated herein, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

The following claims are **DISMISSED**: (1) Plaintiff's failure to accommodate claim against Lofton; and (2) Plaintiff's retaliation claims against IMTT and Lofton. The following claims shall proceed to trial: (1) Plaintiff's discriminatory discharge claims against IMTT and Lofton; and (2) Plaintiff's failure to accommodate claim against IMTT.

## I. BACKGROUND

This is an employment discrimination case. Plaintiff alleges that Defendants Lofton and IMTT, as Plaintiff's joint employers, failed to accommodate Plaintiff, terminated her because of her disability, and retaliated against her because of her disability. (*See* Doc. 1-1).

1

### A. IMTT

IMTT operates a facility in Geismar, Louisiana. (Doc. 12-9, ¶ 2; Doc. 16-2; ¶ 2). In 2019, IMTT used a staffing agency, Lofton, to fill various, temporary positions with Lofton employees at IMTT's Geismar facility. (Doc. 12-9, ¶ 4; Doc. 16-2; ¶ 4). These temporary positions had the potential to become IMTT's direct employees. (Doc. 12-9, ¶ 5; Doc. 16-2; ¶ 5).

On February 11, 2019, Plaintiff began employment at IMTT as a Maintenance Administrator. (Doc. 12-9, ¶¶ 6, 12; Doc. 16-2; ¶¶ 6, 12). IMTT employees Robert Nemeth, General Manager of the Geismar facility, Rebecca Barker, Nemeth's administrative assistant, and Brandon Barker, Director of the Mechanical Division, interviewed Plaintiff for the position. (Doc. 12-9, ¶¶ 8–9; Doc. 16-2; ¶¶ 8–9). Nemeth, Ms. Barker, and Mr. Barker unanimously approved Plaintiff for the temporary Maintenance Administrator position. (Doc. 12-9, ¶ 11; Doc. 16-2; ¶ 11).

### i.    *Cancer Diagnosis*

In May 2019, Plaintiff underwent a procedure to remove what she believed to be a blocked tear duct. (Doc. 12-9, ¶ 54; Doc. 16-2; ¶ 54).  On May 22, 2019, Plaintiff discovered that she actually had eye cancer. (Doc. 12-9, ¶ 55; Doc. 16-2; ¶ 55). Plaintiff informed several IMTT employees regarding her cancer diagnosis, including Nemeth, Barker, and Boudreaux.[1] (Doc. 12-9, ¶ 57; Doc. 16-2; ¶ 57). Plaintiff returned to work at IMTT in late May with no work restrictions. (Doc. 12-9, ¶ 59; Doc. 16-2; ¶ 59).

In mid-July, Plaintiff underwent surgery to remove the cancer from her eye.

---

[1] Plaintiff contends that she also informed John Fage, Director of IMTT's Electrical and Instrumentation Division, regarding her diagnosis.

2

(Doc. 12-9, ¶ 60; Doc. 16-2; ¶ 60). On or around July 29, Plaintiff returned to work with no work restrictions. (Doc. 12-9, ¶ 61; Doc. 16-2; ¶ 61). Following surgery, Plaintiff had to undergo radiation treatment. (Doc. 12-9, ¶ 62; Doc. 16-2; ¶ 62).

### ii.    *Request to Leave Work Early to Attend August 2 Oncology Appointment*

On July 31, 2019, Plaintiff emailed Mr. Barker requesting to leave work early on August 2, 2019, to attend an oncology appointment, where she intended to schedule her radiation treatments. (Doc. 12-2, p. 61, 239:2–9; Doc. 16-4, p. 51). However, on August 2, 2019, prior to her oncology appointment, IMTT terminated Plaintiff, citing poor work performance. (Doc. 12-9, ¶ 51; Doc. 16-2; ¶ 51).

### iii.    *Request for Modified Work Schedule*

Plaintiff claims that she planned to continue working at IMTT while undergoing radiation treatment. (Doc. 12-9, ¶ 63; Doc. 16-2; ¶ 63). The parties dispute whether Plaintiff requested a modified work schedule prior to her August 2 termination. IMTT asserts that Plaintiff did not request a modified work schedule for her upcoming radiation treatments prior to her August 2 termination. (Doc. 12-9, ¶ 66). Contrarily, Plaintiff contends that she requested a modified work schedule to attend her August 2 oncologist appointment, where she would schedule 30 rounds of radiation treatment. (Doc. 16-2, ¶ 66).

### iv.    *August 2 Termination Meeting*

Plaintiff described the August 2 termination meeting as follows. "[Mr. Barker] said 'I know that you've been through a lot, your work is slipping,' and [Mr. Barker] said, 'and you still have a lot to go through so for that fact, we're going to have to let

you go.' And I was escorted out." (Doc. 16-3, p. 32, 91:15–19).

John Fage, Director of IMTT's Electrical and Instrumentation Division, who was present during the termination meeting, described the meeting as follows:

> [Plaintiff] came into the room, [Boudreaux], myself, and [Mr. Barker] were in there and [Boudreaux] didn't speak during the release. I didn't speak during the release. [Mr. Barker] – I can't remember the exact conversation word for word. [Mr. Barker] started off with [Plaintiff], I understand that you're going through a lot with your life – been going through a lot but your performance has still been not up to standard [] and that it was decided that we would no longer use your services. [Plaintiff] was also extremely brief. She said really? Now? And [Mr. Barker] responded yes.

(Doc. 16-5, p. 48–49, 141:17–25, 142:1–11; *see also* Doc. 12-9, ¶ 8).

### v. *August 2 Termination Decision-Making Process*

IMTT contends that Nemeth, the ultimate decisionmaker regarding Plaintiff's termination, was unaware of Plaintiff's upcoming radiation treatments. (Doc. 12-9, ¶¶ 49, 65). Nemeth testified that the reason for Plaintiff's termination was "poor work performance." (Doc. 16-4, p. 31, 74:22–24). Nemeth testified that Plaintiff's cancer and request for time off did not play any role in his decision-making process. (Doc. 16-4, p. 33, 78:6–15).

The undisputed facts, however, show the following. Plaintiff told Nemeth that she was suffering from cancer in May 2019. (Doc. 16-4, p. 3, 27:20–25). When Plaintiff informed Nemeth of her cancer diagnosis, Nemeth told Plaintiff not to worry about her job. (Doc. 16-4, p. 4, 28:14–25). Plaintiff was worried that she would be terminated for missing time, and Nemeth assured her that she would not be terminated for missing time. (Doc. 16-4, p. 4, 28:14–25). Additionally, Plaintiff informed Mr. Barker,

who recommended Plaintiff's termination, that she would undergo radiation treatment in August. (Doc. 12-9, ¶ 64; Doc. 16-2; ¶ 64).

Mr. Barker complained to Nemeth multiple times regarding Plaintiff's work performance. Once, Mr. Barker informed Nemeth about an instance when Plaintiff was loud and unprofessional at the front desk. (Doc. 16-4, p. 10, 38:12–17). Nemeth was surprised to hear from Mr. Barker that Plaintiff's work performance was deficient. (Doc. 16-4, p. 8, 35:9–13). IMTT failed to investigate or document this incident. (Doc. 16-4, p. 10, 38:18–25; 39:1–3). Nemeth did not know whether Mr. Barker or anyone else had meetings with Plaintiff regarding her performance. (Doc. 16-4, p. 20–21, 54:16–25; 55:1–22). Although Mr. Barker complained to Nemeth about Plaintiff's work performance on other occasions, Mr. Barker failed to produce documentation of his complaints. (Doc. 16-4, p. 14–16, 46:13–25; 47:1–25, 48:1–25).

Ultimately, Nemeth decided to terminate Plaintiff based solely on verbal conversations with Mr. Barker, Mrs. Barker, Fage, and Boudreaux. (Doc. 16-4, p. 23, 29. 57:1–17, 68:2–9). These conversations took place at the end of July or early August. (Doc. 16-4, p. 29, 68:2–22). At the time of termination, Nemeth had not received any documentation from Mr. Barker, Mrs. Barker, Fage, or Boudreaux regarding disciplinary action against Plaintiff or conversations regarding work performance with Plaintiff. (Doc. 16-4, p. 31, 74:10–21).

Nemeth made the decision to terminate Plaintiff on July 31, 2019. (Doc. 16-4, p. 29, 68:15–22). Also on July 31, 2019, Plaintiff requested to leave work early to attend an August 2 oncology appointment. (Doc. 16-4, p. 51). Plaintiff was terminated

on August 2, 2019, before she was able to attend her oncology appointment. (Doc. 12-9, ¶ 51; Doc. 16-2; ¶ 51).

### B. Lofton

Lofton is a staffing firm. (Doc. 13-2, ¶ 1; Doc. 16-1; ¶ 1). Plaintiff was Lofton's employee. (Doc. 13-2, ¶ 2; Doc. 16-1; ¶ 2). Lofton submitted Plaintiff's resume to IMTT. (Doc. 13-2, ¶ 4; Doc. 16-1; ¶ 4). On January 29, 2019, IMTT selected Plaintiff for the position. (Doc. 13-2, ¶ 4; Doc. 16-1; ¶ 4). Plaintiff began work at IMTT in February 2019. (Doc. 13-2, ¶ 4; Doc. 16-1; ¶ 4). Plaintiff kept in regular contact with Darlene Mire and Rae Milano at Lofton. (Doc. 13-7, p. 8–10, 15, 26–27, 149:13–22, 150:1–25, 151:1–25, 160:1–20, 181:9–25, 182:10).

Mire, Lofton Personnel Supervisor, communicated with Marion Boudreaux, IMTT Personnel Administrator, regarding Plaintiff's employment with IMTT. (Doc. 13-2, ¶ 5; Doc. 16-1; ¶ 5). On February 25, 2019, Boudreaux told Mire that things were going "well." (Doc. 13-2, ¶ 5; Doc. 16-1; ¶ 5; Doc. 13-3, p. 1–2).

After Plaintiff was diagnosed with cancer, she notified Lofton regarding her diagnosis and indicated that she would need time off for medical appointments. (Doc. 13-2, ¶ 6; Doc. 16-1; ¶ 6). Plaintiff and Mire spoke on the phone on August 2, 2019, following her termination. (Doc. 13-2, ¶ 7; Doc. 16-1; ¶ 7).

Lofton's policy was that Plaintiff should call in each week to inform Lofton of her availability to work that week.[2] (Doc. 13-2, ¶ 8; Doc. 16-1; ¶ 8). If Plaintiff failed

---

[2] While Plaintiff "denies" this statement, her response pertains to a different issue—whether Lofton investigated the basis for Plaintiff's termination. Accordingly, Lofton's statement, uncontroverted by record evidence, is deemed admitted. *See* MDLA Local Rule 56.

to call Lofton, Lofton "presumed" that Plaintiff was unavailable for work that week. (Doc. 13-2, ¶ 8; Doc. 16-1; ¶ 8). In October 2019, Mire notified Plaintiff of another available job. (Doc. 13-2, ¶ 7; Doc. 16-1; ¶ 7). Plaintiff was unable to accept the job because of a previously scheduled radiation treatment. (Doc. 13-2, ¶ 7; Doc. 16-1; ¶ 7).

Thereafter, Plaintiff found employment with GLO Staffing Services. (Doc. 13-2, ¶ 10; Doc. 16-1; ¶ 10).

## II.    LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on motions for summary judgment, courts are required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Coleman v. Hous. Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

To survive summary judgment, however, the nonmoving party must do more than allege an issue of material fact: "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Rule 56

does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citations and quotation marks omitted). A party that fails to present competent evidence opposing a motion for summary judgment risks dismissal on this basis alone. *E.g., Broussard v. Oryx Energy Co.*, 110 F. Supp. 2d 532, 536 (E.D. Tex. 2000) ("Plaintiff produced no genuine issue of material fact to prevent the granting of [Defendant's] Motion, and therefore, the Court could grant [Defendant's] Motion for Summary Judgment on this basis alone.").

## III.   DISCUSSION

### A. Discriminatory Discharge

Both IMTT and Lofton ask the Court to grant summary judgment in its favor regarding Plaintiff's discriminatory discharge claim brought under the Americans with Disabilities Act. (Doc. 12; Doc. 13). The Court will address IMTT and Lofton's arguments separately.

#### i.   *Legal Standard*

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability" by, among other things, terminating the individual's employment. 42 U.S.C. § 12112(a); *see also Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016). If a plaintiff presents only circumstantial evidence to prove her claim, courts apply the *McDonnell Douglas* burden-shifting framework. *Delaval*, 824 F.3d at 479 (citing *McDonnell*

8

*Douglas Corp. v. Green*, 411 U.S. 792 (1973) (additional citations omitted)). If a plaintiff "presents direct evidence of discrimination," then "the *McDonnell Douglas* test is inapplicable." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

Under the *McDonnell Douglas* framework, an employee must show: (1) "[s]he has a disability"; (2) "[s]he was qualified for the job"; and (3) "[s]he was subject to an adverse employment decision on account of h[er] disability." *Delaval*, 824 F.3d at 479 (citing *McDonnell Douglas Corp.*, 411 U.S. at 697).

Once an employee has established a *prima facie* case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for" the adverse employment action. *Delaval*, 824 F.3d at 479 (citing *McDonnell Douglas Corp.*, 411 U.S. at 694). The employee must then present evidence that the articulated reason is pretextual. *Delaval*, 824 F.3d at 479 (citing *McDonnell Douglas Corp.*, 411 U.S. at 694). The United States Court of Appeals for the Fifth Circuit applies a "motivating factor" test, which provides that "discrimination need not be the sole reason for the adverse employment decision ... [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome." *Delaval*, 824 F.3d at 479–80 (citing *McDonnell Douglas Corp.*, 411 U.S. at 702).

### ii.   *Defendant IMTT*

IMTT argues that the Court should grant summary judgment in its favor on Plaintiff's discriminatory discharge claim because: (1) Plaintiff has no direct evidence of discrimination, and thus must proceed under the *McDonnell Douglas* burden-shifting analysis; (2) under the burden-shifting analysis, Plaintiff cannot

establish a *prima facie* case; and (3) even if Plaintiff could establish a *prima facie* case, she cannot establish pretext. (Doc. 12-1, p. 4–12). The Court will address each argument in turn.

### 1. Direct Evidence of Discrimination

IMTT argues that Plaintiff has no direct evidence of discrimination, and thus, must proceed under the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff responds that she has presented direct evidence of discrimination, namely, Mr. Barker's comments during her termination that Plaintiff had "gone through a lot" and had a "lot to go through," which Plaintiff understood to refer to her cancer and upcoming radiation treatments. (Doc. 19, p. 14).

Direct evidence is a "statement or written document showing [an unlawful] motive on its face." *See Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Bennett v. Dallas Indep. Sch. Dist.*, 936 F. Supp. 2d 767, 776 (N.D. Tex. 2013) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897–98 (5th Cir. 2002)). If an inference is required for evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019).

Although it is a close call, the testimony indicates that Barker stated that Plaintiff was "going through a lot," and "still ha[d] a lot to go through," but did not specifically reference Plaintiff's cancer or upcoming radiation treatments. (Doc. 16-3,

p. 32, 91:15–19; Doc. 19, p. 14). Accordingly, an inference is required to determine that Mr. Barker's comments were discriminatory. The Court will proceed under the *McDonnell Douglas* framework.

### 2. Prima Facie Case

To carry her initial burden of proving a *prima facie* discrimination claim under the ADA, Plaintiff must establish "(1) [s]he has a disability or was regarded as disabled; (2) [s]he was qualified for the job; and (3) [s]he was subject to an adverse employment decision because of h[er] disability." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (citing *Williams v. J.B. Hunt Transp.*, 826 F.3d 806, 811 (5th Cir. 2016)).

Here, IMTT does not dispute that Plaintiff was qualified for the job or that she was subject to an adverse employment action. Rather, IMTT argues that Plaintiff cannot establish a *prima facie* case because: (1) Plaintiff does not have a disability; and (2) Plaintiff was not released from IMTT because of her alleged disability. (Doc. 12-1, p. 7–10).

### a)    *Whether Plaintiff Has a Disability*

The ADA defines a person with a "disability" as one who: (1) has an actual "physical or mental impairment that substantially limits one or more major life activities of such individual" (the actual disability prong); (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment" (the regarded as prong). 42 U.S.C. § 12102(1); *see also Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1184 (E.D. Tex. 2011).

11

IMTT argues that Plaintiff does not have a disability because she provided a return-to-work certificate indicating that she had no work restrictions prior to her termination. (Doc. 12-1, p. 8). IMTT contends that Plaintiff was not restricted in any major life activities on the date of her termination, and therefore does not qualify as a disabled individual. (*Id.*). IMTT also points to Plaintiff's EEOC Intake Questionnaire, in which she stated that cancer "does not prevent [her] from doing anything." (*Id.*).

Plaintiff responds that she has cancer, which is a disability. (Doc. 19, p. 12). Plaintiff represents that she is limited in her ability to see, balance, move, walk, and work. (*Id.* at p. 13). Plaintiff also argues that she stated in her EEOC Charge that she is taking medication to correct her vision due to cancer, which is a major life function. (*Id.*).

Plaintiff points the Court to its previous holding in *Lewis v. Cain*, in which the Court found that cancer qualifies as a disability under the ADA. No. 3:15-CV-318, 2021 WL 1219988, at *54 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

In *Lewis*, the Court emphasized the following:

> The ADA Amendments Act of 2008 ("ADAAA") essentially ***broadened the definition of 'disability' to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability.*** The ADAAA did not alter the definition of disability, but it added provisions 42 U.S.C. § 12102(2)-(4) to supersede cases that interpreted the scope of 'disability' narrowly. Under these amendments, the term 'disability' now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, hypertension, asthma, diabetes, major depression, bipolar disorder, schizophrenia, and ***cancer.***

12

*Id.*

Indeed, in *Norton v. Assisted Living Concepts, Inc.*, the U.S. District Court for the Eastern District of Texas held that the plaintiff's "renal cancer is capable of qualifying as a disability under the ADA," emphasizing the broadened scope of the ADA relative to the definition of disability. 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011). The *Norton* court explained:

> The primary way in which Congress chose to broaden the scope of ADA coverage was to expand the law's definition of the term disability. ***Congress' stated purpose in expanding the definition of disability was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'*** This is because 'the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations.'
>
> While the ADAAA retained the three prong definition of disability, [] it significantly expanded the meaning of terms included in that definition. Thus, the Act expanded the meaning of terms under the actual disability prong, which, as stated previously, defines a person with a disability as one who has an actual 'physical or mental impairment that substantially limits one or more major life activities of such individual.' 42 U.S.C. § 12102(1).

*Id.* at 1184–85 (internal citations omitted). The *Norton* court then outlined significant changes to the ADA as follows:

> (1) The ADA now states that ***"[t]he definition of 'disability' [under the Act] shall be construed in favor of broad coverage of individuals*** ... to the maximum extent permitted by the terms [of the Act]." 42 U.S.C. § 12102(4)(A).
>
> (2) The definition of "major life activities" under the Act's actual disability prong was expanded to include the operation of "major bodily functions." 42 U.S.C. § 12102(2)(B). The Act now includes a sample list of major bodily functions that constitute a major life activity; this list includes "normal cell growth." *Id.*

13

(3) The Act emphasizes that the term "substantially limit" under the actual disability prong shall be interpreted as broadly as possible. 42 U.S.C. § 12102(4)(A) & (B).

(4) The Act now clarifies that as long as an impairment substantially limits one major life activity, such as normal cell growth, it need not limit other major life activities, such as working, in order to be considered a disability. 42 U.S.C. § 12102(4)(C).

(5) Finally, the Act explains that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity [such as normal cell growth] when active." 42 U.S.C. § 12102(4)(D).

*Id.*

Applying these provisions to the facts of *Norton*, the Eastern District of Texas found that "renal cancer, when active, 'substantially limits' the 'major life activity' of 'normal cell growth.'" *Id.* at 1185 (citing 42 U.S.C. § 12102(4)(A) & (B); 42 U.S.C § 12102(2)(B)). The *Norton* court further clarified that even if plaintiff's cancer only substantially limited normal cell growth, and no other life activities, it would still qualify as a disability. *Id.* (citing 42 U.S.C. § 12102(4)(C)).

Here, Plaintiff represents that she is limited in her ability to see, balance, move, walk, and work. (Doc. 19, p. 13). Plaintiff identified in her EEOC charge that she is taking medication to correct her vision due to her cancer. (*Id.*). However, the Court notes the apparent inconsistency in Plaintiff's statements, as she stated in her EEOC Intake Questionnaire that cancer "does not prevent [her] from doing anything." (Doc. 12-1, p. 8).

Despite this discrepancy, the Court finds that Plaintiff's cancer qualifies as a disability under the ADA for the following reasons. At the time of her termination, Plaintiff had active cancer and IMTT was aware of same. Congress's stated purpose

14

in expanding the definition of disability was to convey that the question of whether an individual's impairment is a disability under the ADA should not demand an extensive analysis. The Court is also persuaded by the *Norton* court's finding that even if plaintiff's cancer only substantially limited normal cell growth, and no other life activities, it would still qualify as a disability. *Norton*, 786 F. Supp. 2d at 1185 (citing 42 U.S.C. § 12102(4)(C)).

### b)    *Whether Plaintiff was Terminated Because of Her Disability*

Because the analysis of whether Plaintiff was terminated because of her disability and whether the stated reasons for Plaintiff's termination are pretextual are inextricably intertwined, the Court will assume *arguendo* that Plaintiff has established her *prima facie* case and proceed to the pretext phase of the analysis.

### 3.  Pretext

IMTT argues that Plaintiff was not released because of her disability, but because of a legitimate, nondiscriminatory reason—her "sustained, poor work performance." (Doc. 12-1, p. 10, 12). Nemeth, who had the sole authority to release Plaintiff, testified that he made the decision to terminate plaintiff based on her poor work performance, and that neither her cancer nor her request for time off related to that diagnosis played a role in her decision. (*Id.* at p. 10). IMTT contends that to defeat summary judgment, Plaintiff must come forward with credible evidence that IMTT's legitimate, non-discriminatory reason is mere pretext for discrimination. (*Id.* at p. 13).

Plaintiff responds that IMTT's stated reason for termination is pretext, citing

the following evidence.

First, Plaintiff was terminated within three months of her cancer diagnosis. (Doc. 19, p. 15). Specifically, Plaintiff was diagnosed with cancer in May 2019 and terminated in August 2019. (Doc. 12-9, ¶¶ 51, 55; Doc. 16-2; ¶¶ 51, 55).

Second, Plaintiff contends that she was terminated two days after she requested a modified schedule to attend radiation treatment. (Doc. 19, p. 15). Specifically, Plaintiff informed Mr. Barker that she needed to leave work early on July 31, 2019, for an August 2, 2019 oncology appointment. (Doc. 16-4, p. 51). On August 2, 2019, prior to her oncology appointment, Mr. Barker terminated Plaintiff. (Doc. 12-9, ¶ 51; Doc. 16-2; ¶ 51).

Third, during the termination meeting, Mr. Barker told Plaintiff that he knew she had been through "a lot" and had to go through "a lot," which Plaintiff understood to refer to her cancer diagnosis and upcoming radiation treatment, of which Mr. Barker was aware. (Doc. 16-3, p. 32, 91:15–19; Doc. 19, p. 14).

Fourth, Plaintiff points to IMTT's lack of documentary evidence demonstrating that Plaintiff's work performance was poor. (Doc. 19, p. 17). Indeed, Nemeth decided to terminate Plaintiff on July 31, 2019, based solely on verbal representations from Mr. Barker, Mrs. Barker, Fage, and Boudreaux. (Doc. 16-4, p. 23, 29. 57:1–17, 68:2–9). Nemeth had no documentation regarding Plaintiff's alleged poor work performance. (Doc. 16-4, p. 31, 74:10–21).

Applying the Fifth Circuit's "motivating factor" test, the Court finds that a genuine issue of material fact regarding IMTT's reasons for terminating Plaintiff

precludes summary judgment. *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479–80 (5th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (discrimination need not be the sole reason for the adverse employment decision so long as it actually plays a role in the employer's decision making process and has a determinative influence on the outcome). A jury could very well conclude that IMTT'S reason for termination—"poor work performance"—is false or unworthy of credence. *See Delaval*, 824 F.3d at 480 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) ("Pretext is established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.") (internal quotations omitted). Accordingly, IMTT's Motion for Summary Judgment regarding Plaintiff's discriminatory discharge claim (Doc. 12) is **DENIED.**

### iii.    *Defendant Lofton*

Lofton moves for summary judgment regarding Plaintiff's discriminatory discharge claim. (Doc. 13-1, p. 11). Plaintiff responds that the Court may hold Lofton liable for IMTT's discriminatory conduct as a "joint employer." (Doc. 19, p. 24).

The parties agree that Lofton may be liable for IMTT's alleged discriminatory conduct if Lofton: "[1] participate[d] in the discrimination, or [2] [] kn[ew] or should have known of [IMTT's] discrimination but fail[ed] to take corrective measures within its control." *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 189 (5th Cir. 2016) (citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 229

(5th Cir. 2015)).[3] The Fifth Circuit clarified the relevant standard as follows: the "staffing agency [Lofton] must have knowledge of the discrimination [by IMTT] to establish its 'participation' or failure to take corrective action." *Id.* at 190. The Circuit specifically held that "a staffing firm participates in discrimination by honoring a client's discriminatory transfer request ***only if it knows or should have known the client's reasons were discriminatory.***" Accordingly, the Court first turns to whether Lofton knew or should have known of IMTT's alleged discriminatory reasons for Plaintiff's termination.[4] Lofton contends that it did not know, nor could it have known, of IMTT's alleged discriminatory reasons for termination. (Doc. 24, p. 5). Plaintiff disagrees.

Regarding actual knowledge, Lofton argues that there is no evidence showing that it knew that IMTT had a discriminatory motive for terminating Plaintiff. (*Id.*).

---

[3] Notably, both parties rely on the Fifth Circuit's decision in *Nicholson v. Securitas Sec. Servs. USA, Inc.* as providing the proper legal standard. 830 F.3d 186, 189 (5th Cir. 2016) (citing *Burton*, 798 F.3d at 229).

[4] Like *Nicholson*, Plaintiff's evidence fails to show that Lofton itself had a discriminatory motive independent of what IMTT may have intended. To the extent Plaintiff argues that Lofton failed to reemploy her, or that she believed Lofton terminated her, these arguments fall flat.

The undisputed facts show that Lofton notified Plaintiff of another available job in October 2019. (Doc. 13-2, ¶ 7; Doc. 16-1; ¶ 7). Plaintiff was unable to accept the job because of a previously scheduled radiation treatment. (*Id.*). Accordingly, Lofton did not "refuse" to reemploy Plaintiff. The evidence also shows that Lofton's policy was that Plaintiff should call in each week to inform Lofton of her availability to work that week. (Doc. 13-2, ¶ 8; Doc. 16-1; ¶ 8). If Plaintiff failed to call Lofton, Lofton "presumed" that Plaintiff was unavailable for work that week. (Doc. 13-2, ¶ 8; Doc. 16-1; ¶ 8).

Regarding Plaintiff's "feeling" that Lofton terminated her, the undisputed facts show that Plaintiff was not terminated by Lofton, particularly because Lofton offered her additional work at a later time. (Doc. 16-3, p. 59–60, 162:24–25, 163:1–14, 163:18–24).

In response, Plaintiff fails to provide evidence indicating that Lofton had actual knowledge of same.

Regarding constructive knowledge, Lofton points to the following evidence to show that it could not have known of IMTT's allegedly discriminatory reasons for termination. (Doc. 24, p. 5). First, Plaintiff testified that she was routinely in contact with Mire and others at Lofton, but never spoke with anyone at Lofton about challenges she had while working at IMTT. (*Id.*; Doc. 13-7, p. 8–10, 15, 26–27, 149:13–22, 150:1–25, 151:1–25, 160:1–20, 181:9–25, 182:10). Second, Plaintiff told Mire that she loved the job at IMTT and that it was a wonderful place to work. (Doc. 24, p. 5; Doc. 13-3, Doc. 13-10). Third, Mire attested that Plaintiff never informed her that she was experiencing discrimination, harassment, or retaliation while working at IMTT. (Doc. 24, p. 6; Doc. 13-10). Fourth, Mire was in contact with Boudreaux, who told Mire that Plaintiff was doing well. (Doc. 24, p. 6; Doc. 13-3; Doc. 13-10).

Plaintiff responds that the following, taken together, are sufficient to show that Lofton should have known of IMTT's alleged discriminatory conduct: Lofton knew that IMTT was terminating Plaintiff prior to her termination; Lofton knew that Plaintiff had active cancer; and Lofton knew that Plaintiff would need accommodations. (Doc. 19, p. 25).

In *Nicholson*, the Fifth Circuit found that a genuine issue of material fact precluded summary judgment regarding whether a staffing agency should have known of discrimination from its client-employer when the staffing agency failed to

investigate the circumstances of the client-employer's reassignment request and deviated from its standard evaluation practices. *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 191 (5th Cir. 2016). Here, the record evidence shows that Lofton knew that IMTT intended to terminate Plaintiff prior to her termination but failed to investigate the circumstances of same prior to the termination meeting.[5] Lofton did not even ask IMTT for an explanation for Plaintiff's termination prior to same. In this way, the instant case is similar to *Nicholson*.[6] Unlike *Nicholson*, however, Plaintiff failed to provide evidence showing that Lofton deviated from its standard practice or policy here.[7]

---

[5] Prior to the termination meeting, Boudreaux of IMTT called Milano of Lofton to inform Lofton that IMTT would be terminating Plaintiff. (Doc. 13-1, p. 24). Boudreaux testified as follows:

> Q. Did you communicate with Lofton that you guys were going to release [Plaintiff] before you had the meeting with her?
>
> A. Yes.
>
> Q. Tell me about that, please?
>
> . . .
>
> A. I just called [Milano] and notified her that we would be releasing [Plaintiff] today and she asked how—because normally we get [Milano] to call people and tell them they're no longer needed. Her services have ended. And I notified [Milano] that we would be doing that because we needed to do that ourselves.

(Doc. 13-9, p. 4–5, 77:12–25, 78:1–5).

[6] Lofton argues, however, that the window of time between when IMTT informed Lofton of Plaintiff's upcoming termination and the actual termination meeting was very short. (Doc. 13-1, p. 24).

[7] In *Nicholson*, plaintiff relied in part on the client-employer's guideline that dictated that inefficient performance is an action that normally does not result in immediate termination and instead is addressed through counseling. *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 190 (5th Cir. 2016).

Recognizing that it is a close call, the Court finds that a genuine issue of material fact precludes summary judgment regarding whether Lofton should have known of IMTT's allegedly discriminatory reasons for terminating Plaintiff. Specifically, Lofton knew that it had an obligation under federal law to ensure that its employees were not subject to discrimination. Lofton knew that Plaintiff had active cancer and had recently requested accommodations, yet failed to investigate the circumstances of her termination until after Plaintiff was terminated. A jury may find that Lofton should have known of IMTT's allegedly discriminatory reasons for terminating Plaintiff.

Accordingly, Lofton's Motion for Summary Judgment regarding Plaintiff's discriminatory discharge claim (Doc. 13) is **DENIED.**

### B. Failure to Accommodate

Both IMTT and Lofton ask the Court to grant summary judgment in its favor regarding Plaintiff's failure to accommodate claim brought under the Americans with Disabilities Act. (Doc. 12; Doc. 13). The Court will address IMTT and Lofton's arguments separately.

### i. *Legal Standard*

"Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Clark v. Champion Nat'l Sec., Inc.,* 952 F.3d 570, 587 (5th Cir.), *cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc.,* 141 S. Ct. 662, 208 L. Ed. 2d 272 (2020) (internal citations omitted). Plaintiff "must prove the following statutory elements to prevail

in [his] failure-to-accommodate claim: (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Id.* (citing *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

## ii.    Defendant IMTT

IMTT argues that the Court should dismiss Plaintiff's failure to accommodate claim because Plaintiff did not make IMTT aware of the specific limitations resulting from her cancer.[8] (Doc. 12-1, p. 22). Specifically, IMTT argues that it did not fail to accommodate Plaintiff because: (1) Plaintiff intended to request a modified work schedule after her August 2, 2019 oncology appointment; and (2) Plaintiff was fired on August 2, 2019 prior to her appointment with her oncologist. (Doc. 20, p. 8). Accordingly, Plaintiff did not actually "request" an accommodation, so IMTT did not fail to accommodate her. (*Id.*). IMTT also relies on the lack of work restrictions on Plaintiff's return-to-work certificate.

The undisputed facts show the following. On July 31, 2019, Plaintiff requested to leave work early on August 2, 2019 to attend an oncologist appointment:

| | |
|---|---|
| **From:** | Babin, Kimberly |
| **Sent time:** | 07/31/2019 09:25:35 AM |
| **To:** | Barker, Brandon |
| **Subject:** | Dr's Appt |

I have to leave at 12:00 Friday August 2, 2019.  I have a appt with oncologist

---

[8] IMTT also asserts that Plaintiff fails to establish a *prima facie* case because she is not a qualified individual with a disability. The Court previously found this argument to be unpersuasive, as described *supra* in Section III(A)(ii)(2)(a).

(Doc. 16-4, p. 51). The purpose of Plaintiff's August 2 oncologist appointment was to schedule her radiation treatments. (Doc. 12-2, p. 61, 239:2–9). After scheduling radiation treatments with her oncologist, Plaintiff intended to ask IMTT for a modified work schedule. (*Id.*). Plaintiff intended to continue to work during her radiation treatments. (Doc. 12-9, ¶ 63; Doc. 16-2; ¶ 63). Before Plaintiff had the chance to visit the oncologist and schedule radiation treatments, IMTT terminated her.

The Court finds this case similar to *Cutrera v. Bd. of Supervisors of Louisiana State University*, 429 F.3d 108 (5th Cir. 2005). There, the Fifth Circuit reversed summary judgment in favor of the employer and emphasized the following:

> ***An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.*** In [*Cutrera*], [the ADA coordinator's] awareness of [plaintiff's] meeting with a rehabilitation counselor and her intention to return to work triggered the [employer's] obligation to participate in an interactive process with [plaintiff] to attempt to identify a reasonable accommodation for [plaintiff's] disability. Reviewing these facts, and all inferences drawn from those facts, in the light most favorable to Appellant Cutrera, we conclude that summary judgment for Appellees based on the argument that [plaintiff] failed to request an accommodation would be inappropriate.

*Cutrera*, 429 F.3d at 113.

Reviewing the instant facts, and all inferences drawn from those facts, in the light most favorable to Plaintiff, the Court finds that summary judgment in favor of IMTT based on the argument that Plaintiff failed to request an accommodation would be inappropriate when IMTT terminated Plaintiff on the morning of her oncology

appointment at which Plaintiff created her treatment schedule with her oncologist. Accordingly, IMTT's Motion for Summary Judgment (Doc. 12) regarding Plaintiff's failure to accommodate claim is **DENIED.**

### iii.  *Defendant Lofton*

Lofton moves for summary judgment on Plaintiff's failure to accommodate claim, arguing that it did not fail to accommodate Plaintiff. (Doc. 13-1, p. 17). Plaintiff testified that in May or June of 2019, Plaintiff told Mire that she would need "time off to go to doctor's appointments and whatever [she had] to go through." (*Id.* at p. 8–9, 149:25, 150:1–23)). Mire told Plaintiff that she would have to go through IMTT regarding her request for time off. (*Id.* at p. 9, 150:10–17)). Beyond that request, Plaintiff testified that she had no other conversations with anyone at Lofton wherein she asked for assistance or a change in working conditions. (*Id.* at p. 9–10, 150:23–25; 151:1-4). After her August 2, 2019 oncology appointment, Plaintiff did not request any time off from Lofton to attend her radiation treatments, and did not request any other accommodation. (*Id.* at p. 11, 153:11–15).

Citing no record evidence, Plaintiff responds that "Lofton also failed to engage in the interactive process and reasonably accommodate her after it learned that she was going to need a modification/change in schedule once she began radiation treatments for her cancer." (Doc. 19, p. 26). This argument alone, unsupported by record evidence, is insufficient to create a genuine issue of material fact that Lofton failed to accommodate Plaintiff. Accordingly, Lofton's Motion for Summary Judgment (Doc. 13) regarding Plaintiff's failure to accommodate claim is **GRANTED.**

## C. Retaliation—Defendants IMTT and Lofton

Both Defendants contend that Plaintiff has abandoned her retaliation claim because she stated during her deposition that she no longer intended to pursue it. (Doc. 12-1, p. 13; Doc. 13-1, p. 22–23). Plaintiff responds that she alleged a retaliation claim in her Petition and pursued it during discovery and deposition questioning. (Doc. 19, p. 20). Accordingly, Plaintiff argues that she has not withdrawn or abandoned her claim. (*Id.*).

The Court has previously emphasized:

> The Fifth Circuit has held that a claim or defense may be abandoned (or waived) when a party fails to pursue it beyond their initial pleading. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("[T]o the extent Black established a separate claim based on her reduced schooling, she failed to pursue it. She further failed to defend [the claim] in both responses to the defendant's motion to dismiss. Her failure to pursue this claim beyond her complaint constituted abandonment.").

> Consistently, some courts have found abandonment based on deposition testimony. *See Moore v. United Postal Service*, 2004 WL 2339792, at *11 (N.D. Tex. Oct. 15, 2004) (In response to deposition questions about certain claims alleged in his complaint, plaintiff stated: "I'm not claiming that." The court therefore "conclude[d] that [Plaintiff] ha[d] clearly abandoned or [was] no longer asserting" those claims.); *Russell v. Degussa Engineered Carbons*, 2007 WL 433284, at *12 (S.D. Tex. Feb. 6, 2007) (finding intentional infliction of emotional distress claim failed where, in his complaint, the plaintiff asserted that he had been mocked for his disability, but, during his deposition, "denied that the other employees talked about any of his mental impairments").

*Williams v. Petroleum*, No. CV 18-1012-JWD-SDJ, 2021 WL 649786, at *5 (M.D. La. Feb. 3, 2021), *report and recommendation adopted*, No. CV 18-1012-JWD-SDJ, 2021 WL 641543 (M.D. La. Feb. 18, 2021).

Here, Plaintiff testified to the following:

25

Q. Are you alleging in this lawsuit that [Mr. Barker] fired you in response to you doing something specific?

A. [] [Mr.] Barker fired me because I had a disability, and he told me he did.

Q. And is that your only claim in this lawsuit against IMTT and Lofton?

A. Yes. [] [Mr.] Barker fired me because of my disability.

Q. So, you are not alleging that he fired you in response to you doing something specific?

A. No.

(Doc. 13-7, p. 5, p. 126:9–20; Doc. 12-1, p. 14). The Court agrees that based on Plaintiff's own testimony, she has abandoned her retaliation claim. Accordingly, IMTT and Lofton's Motions for Summary Judgment (Doc. 12; Doc. 13) regarding Plaintiff's retaliation claim are **GRANTED.**

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant IMTT-Gesimar's **Motion for Summary Judgment (Doc. 12)** is **GRANTED IN PART** and **DENIED IN PART.** Plaintiff's retaliation claim against IMTT is **DISMISSED.** Plaintiff's discriminatory discharge and failure to accommodate claims against IMTT shall proceed to trial.

**IT IS FURTHER ORDERED** that Defendant The Lofton Corporation's **Motion for Summary Judgment (Doc. 13)** is **GRANTED IN PART** and **DENIED IN PART.** Plaintiff's failure to accommodate and retaliation claims against Lofton are **DISMISSED.** Plaintiff's discriminatory discharge claim against Lofton shall proceed to trial.

Baton Rouge, Louisiana, this _____29th_____ day of June, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

27